[Cite as *State v. Woodburn*, 2019-Ohio-2757.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

STATE OF OHIO,            :      Case No. 18CA891

　　　Plaintiff-Appellee,      :

v.                        :      <u>DECISION AND</u>
                                 <u>JUDGMENT ENTRY</u>

KATHY WOODBURN,           :

　　　Defendant-Appellant.     :      **RELEASED: 06/26/2019**

_____
<u>APPEARANCES</u>:

Michael J. Lawson, Esq., Columbus, Ohio, for appellant.

Robert Junk, Pike County Prosecuting Attorney, and Michael A. Davis, Pike County Assistant Prosecuting Attorney, Waverly, Ohio, for appellee.
_____
Hess, J.

**{¶1}** Following a bench trial, the trial court found Kathy Woodburn guilty of two counts of theft from a person in a protected class in violation of R.C. 2913.02(A)(1) and (A)(2), merged the counts for sentencing purposes, and sentenced her for the violation of R.C. 2913.02(A)(1). The convictions stemmed from Woodburn's withdrawal and use of funds from a joint and survivorship bank account held by Woodburn, her mother, and her daughter. The trial court found Woodburn's mother owned some of the money.

**{¶2}** Woodburn contends that the trial court's findings of guilt are against the manifest weight of the evidence because the evidence shows she owned the funds, had authority to withdraw them from the joint account, and did not owe a fiduciary duty to her mother. Based on Woodburn's own statements, the trial court reasonably could conclude, beyond a reasonable doubt, that Woodburn's mother owned a portion of the

funds. However, the state presented no evidence that Woodburn obtained or exerted control over the funds in the joint account without her mother's consent; rather, the evidence, including the account agreement, demonstrates Woodburn had consent to obtain and exert control over the funds. Therefore, the finding that Woodburn violated R.C. 2913.02(A)(1) is not supported by sufficient evidence and is therefore necessarily against the manifest weight of the evidence. The finding that Woodburn violated R.C. 2913.02(A)(2) is not against the manifest weight of the evidence because the evidence supported a finding that she exceeded the scope of consent when she used her mother's funds for personal expenses. Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTS

{¶3} In 2006, Woodburn's father, Lawrence Zimmerman, entered an annuity contract with Allstate Life Insurance Company and designated his wife and Woodburn's mother, Bertha Zimmerman, as his primary beneficiary. In 2010, Lawrence gave Bertha a power of attorney, and in September 2014, she used it to request that $75,000 from the annuity be distributed and deposited into an account she and Lawrence had at U.S. Bank. Bertha planned to loan this money to Woodburn to build a barn with an apartment for Bertha and Lawrence.

{¶4} On October 3, 2014, Woodburn, Bertha (who was age 75), and Ashley Higginbotham (Woodburn's daughter) executed a membership application and agreement to open a joint and survivorship account at Atomic Credit Union ("ACU"). The agreement requested "24-hour access" to the account and a Debit MasterCard for each account holder. This would allow each holder to use ATMs and pay for services

and purchases directly from the checking account. The same day, $1,000 of the $75,000 annuity distribution was deposited into the ACU checking account and the remaining $74,000 was deposited into the ACU savings account.

{¶5} On October 24, 2014, Bertha again used her power of attorney to request "full surrender" of the remaining annuity balance via a check sent to Lawrence. Tyler Williams, a former U.S. Bank employee, helped Bertha close the annuity because U.S. Bank acted as an agent to Allstate with regard to annuities. According to him, Bertha said the money was going to "the credit union" and Woodburn was going to "help manage my money" and help take care of Bertha. On October 28, 2014, Allstate issued a check to Lawrence for $109,569.21. After he endorsed the check, Woodburn endorsed it and deposited the funds into the ACU savings account on November 1, 2014. On November 13, 2014, Lawrence died. By November 30, 2014, the ACU savings account had a balance of $5.00 and the checking account had a balance of $5,290.64. By July 15, 2015, the checking account was empty.

{¶6} Evidently due to memory issues, Bertha forgot that she had closed the annuity and forgot about the ACU checking and savings account. At some point, she went to U.S. Bank and learned she had no money left. According to Bertha, she never authorized Woodburn to put her money into Woodburn's personal account, spend her money on Woodburn or others, or spend her money without her permission.

{¶7} The Pike County Prosecutor's Office became involved and requested assistance from the Bureau of Criminal Investigation ("BCI"). Special Agent Kevin Barbeau, a certified fraud examiner at BCI, found no evidence that Bertha was coerced into signing any documents. However, he found $113,625.98 from the following

sources "should have benefited Bertha": the $109,569.21 annuity check deposited into the ACU savings account, a $1,271.45 check from Washington National Insurance Company payable to Bertha and deposited into the ACU savings account, and $2,785.32 in payments from Lawrence's pension that were directly deposited into the personal checking account of Woodburn and her husband. He found that of these funds, $21,259.35 was expended for Bertha's benefit, and $92,366.63 had been stolen. Agent Barbeau found that on November 30, 2014, Woodburn transferred $147,282.47 from the ACU savings account to her and her husband's personal checking account. Based on the records from that checking account, Agent Barbeau determined that between October 7, 2014, and November 30, 2015, Woodburn and her husband had income of $65,229.15 and expenses of $205,838.96. Agent Barbeau noted their expenses included items such as their mortgage, their insurance, dining, and personal care. Agent Barbeau did not know where cash that had been withdrawn from the ACU checking or savings account went.

{¶8} Agent Barbeau interviewed Woodburn, who stated that after Bertha "cashed in CD's" that belonged to Lawrence, the money was put into the ACU account. The money was "for the use of" Bertha and for building a barn with an apartment for Bertha and Lawrence. Woodburn claimed the barn was built but the apartment was not because Lawrence "got sick and died very quickly" and Bertha wanted to live elsewhere. Woodburn claimed an attorney told Bertha that "she was either going to allow us to be able to take care of the money, or he was going to take over guardianship of her." Woodburn asserted the attorney told her that Lawrence did not want Bertha to "be able to have sole access to the money" because other relatives had asked for loans

"several times." Woodburn stated that after Lawrence died, she told Bertha, "Mom you know what [the lawyer] said that you needed to make sure that your funds were not where anyone had access." Woodburn told Bertha, "I am moving it into my account," and Bertha said "go ahead." Woodburn claimed Bertha "had access to her money, if she needed it" and just had to ask for it. Woodburn admitted Bertha was entitled to money from Lawrence's retirement fund and claimed Bertha agreed to this money being deposited into Woodburn's account. Woodburn stated she applied that money to Bertha's bills. Woodburn claimed that she always told Bertha when she was using Bertha's money and that Bertha consented to Woodburn using her money for Woodburn's personal expenses. Woodburn stated Bertha "did not worry about any of the money being paid back, because she knew we were going to take care of her."

{¶9} The Pike County grand jury indicted Woodburn on the following: (1) Count One, theft from a person in a protected class in violation of R.C. 2913.02(A)(1), a second-degree felony because the victim was an elderly person and the value of the property taken was $37,500 or more and less than $150,000; (2) Count Two, theft from a person in a protected class in violation of R.C. 2913.02(A)(2),[1] a second-degree felony because the victim was an elderly person and the value of the property taken was $37,500 or more and less than $150,000; (3) Count Three, telecommunications fraud in violation of R.C. 2913.05(A), a third-degree felony; and (4) Count Four, money laundering in violation of R.C. 1315.55(A)(1), a third-degree felony.[2] Woodburn waived her right to a jury trial, and during the bench trial, defense counsel argued that pursuant

---

[1] Count Two of the indictment cites R.C. 2913.02(A)(1) but its language tracks R.C. 2913.02(A)(2).
[2] The grand jury also indicted Woodburn's husband and daughter.

to *Wright v. Bloom*, 69 Ohio St.3d 596, 635 N.E.2d 31 (1994), Bertha "at most" had a one-third interest in the funds at issue based on the joint account agreement.

{¶10} The trial court found Woodburn guilty on Counts One and Two but determined the amount taken was $30,788.87, i.e., one third of the $92,366.63 the state argued had been stolen.[3]  Because that amount was $7,500 or more and less than $37,500, the court reduced the counts to third-degree felonies.  It found Woodburn not guilty on the other counts.  The state stipulated that Counts One and Two were allied offenses of similar import that merged for sentencing purposes and elected to have the court sentence Woodburn on Count One.  The court imposed five years of community control and ordered Woodburn to pay Bertha $30,788.87 in restitution.

## II.  ASSIGNMENTS OF ERROR

{¶11} Woodburn assigns the following error for our review:[4]

I.      The trial court erred in applying Ohio joint account law when there is a joint survivorship agreement superseding the presumption of [p]roportionate deposits as ownership.

II.     The trial court erred in applying joint account law without considering the Joint Account agreement with survivorship, when no agreement exists.

III.    The trial court erred in finding that Kathy Woodburn was not an owner or person authorized to obtain and exert control over the funds allegedly stolen from Bertha Zimmerman.

IV.     The trial court erred in any determination that Bertha Zimmerman had an interest in the $109,366.21 annuity funds given to Kathy Woodburn prior to depositing the funds into the Joint Account.

---

[3] This decision implies the trial court concluded that the $92,366.63 came from the ACU account, which had three account holders, and did not include the pension money deposited directly into the personal account of Woodburn and her husband.

[4] The assignments of error are taken from pages 1-2 of Woodburn's appellate brief. Some of the assignments of error are stated differently elsewhere in the brief.

V.      The trial court err[ed] by concluding that Kathy Woodburn had a fiduciary role in relation to Bertha Zimmerman regarding funds given to her [b]y Lawrence Zimmerman.

## III. LAW AND ANALYSIS

### A. Standard of Review

{¶12} Although Woodburn asserts that her assignments of error raise both questions of law subject to de novo review and a manifest weight of the evidence challenge, the arguments in support of her assignments of error primarily focus on the weight of the evidence supporting her convictions.

{¶13} *State v. Brown*, 4th Dist. Ross No. 18CA3643, 2018-Ohio-5431, states:

> To determine whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. If the state presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the state established the essential elements of the offense, the judgment of conviction is supported by the manifest weight of the evidence.

(Citations omitted.) *Id.* at ¶ 17. "The trier of fact is free to believe all, part, or none of the testimony of any witness, and we defer to the trier of fact on evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Miller*, 4th Dist. Hocking No. 18CA3, 2019-Ohio-92, ¶ 28.

### B. Relevant Statutory Provisions

{¶14} R.C. 2913.02(A)(1) and (A)(2) state:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent[.]

**{¶15}** " 'Obtain' means ' "just what it says, to get, to secure possession of." ' " *State v. Dobbins*, 4th Dist. Washington No. 11CA6, 2011-Ohio-6777, ¶ 12, quoting *State v. Healy*, 156 Ohio St. 229, 239, 102 N.E.2d 233 (1951), quoting *Tingue v. State*, 90 Ohio St. 368, 372, 108 N.E. 222 (1914). "And 'control' means: '1. To exercise power or influence over. 2. To regulate or govern. 3. To have a controlling interest in.' " *Id.*, quoting *Black's Law Dictionary* 143 (2d Pocket Ed.2001). " 'Owner' means, * * * any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services * * *." R.C. 2913.01(D).

### C.  Caselaw on Joint and Survivorship Bank Accounts

**{¶16}** In *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-Ohio-2418, 847 N.E.2d 405, the Supreme Court of Ohio stated:

> "The existence of a joint and survivorship bank account raises a rebuttable presumption that co-owners of the account share equally in the ownership of the funds on deposit." *Vetter v. Hampton* (1978), 54 Ohio St.2d 227, 8 O.O.3d 198, 375 N.E.2d 804, paragraph three of the syllabus. This presumption applies in the absence of evidence to the contrary. Id. at paragraph four of the syllabus; see *Wright v. Bloom* (1994), 69 Ohio St.3d 596, 602-603, 635 N.E.2d 31. "A joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." *In re Estate of Thompson* (1981), 66 Ohio St.2d 433, 20 O.O.3d 371, 423 N.E.2d 90, paragraph one of the syllabus; see Uniform Probate Code 6-103. * * * [A]lthough [*Thompson*] adopted a new presumption for determining ownership of joint and survivorship accounts, the presumption of equal ownership continues to exist when net contributions are not proven. See Uniform Probate Code 6-103, Official Comment (courts should "divide the account equally among the parties to the extent that net contributions cannot be proven").

*Id.* at ¶ 12. "Net contributions" are " 'the sum of all deposits to an account made by or for the party, less all payments from the account made to or for the party which have not been paid to or applied to the use of another party and a proportionate share of any charges deducted from the account, plus a proportionate share of any interest or dividends earned.' " *Id.* at ¶ 13, quoting Uniform Probate Code 6–211. "[E]vidence of net contributions must be proven by a preponderance of the evidence." *Id.* at ¶ 15.

### D. Ownership

**{¶17}** In some of her assignments of error, Woodburn challenges the trial court's finding that Bertha owned $30,788.87 of the funds the state alleged had been stolen. In the first assignment of error, she argues that the presumption of ownership in proportion to net contributions does not apply to money deposited into ACU because there is clear and convincing evidence of a different intent. She appears to argue she had an ownership interest in all of the ACU account funds because the ACU agreement shows an intent to have a shared account and all of the funds were available to her. In the second assignment of error, Woodburn argues that if the presumption of ownership in proportion to net contributions applies, she owned the $109,366.21 in annuity funds because she contributed that money to the ACU savings account by endorsing and depositing the annuity check. In the third assignment of error, Woodburn asserts in part that she owned the money at ACU because the ACU agreement authorized her to withdraw the money without consent from any other account holder. In the fourth assignment of error, Woodburn asserts the trial court erred to the extent it determined Bertha had an interest in the $109,366.21 before it was deposited into ACU because Lawrence gave the money to Woodburn before he died.

**{¶18}** Our research has not revealed any cases from the Supreme Court of Ohio or this court applying the above presumptions regarding the ownership of funds in joint and survivorship bank accounts in a criminal case. We found only one Ohio appellate court decision that has considered them in a criminal case. *State v. Warrix*, 2d Dist. Montgomery No. 26556, 2015-Ohio-5390, ¶ 33-34 (affirming denial of motion to withdraw guilty plea to theft from an elderly or disabled person because defendant's assertion that joint and survivorship accounts permitted her to spend the funds at issue during the victim's lifetime was unavailing based on the presumption of ownership in proportion to net contributions and undisputed evidence that the accounts were funded by money that belonged to the victim). To the extent these presumptions are relevant in a criminal case, they cannot relieve the state of the burden of persuasion on an element of an offense. *See generally Francis v. Franklin*, 471 U.S. 307, 314-315, 105 S.Ct. 1965, 85 L.E.2d 344 (1985) (discussing mandatory presumptions and permissive inferences and when they violate the Due Process Clause).

**{¶19}** Here, the state presented substantial credible evidence upon which the trial court reasonably could conclude, beyond a reasonable doubt, that Bertha owned at least $30,788.87 of the funds the state alleged had been taken. Even though the ACU agreement indicates all three account holders had access to account funds and Woodburn endorsed and deposited the $109,366.21 annuity check, her own statements demonstrate that money belonged to and was deposited for Bertha. During the interview by Agent Barbeau, Woodburn never claimed Lawrence gave her that money. Rather, she acknowledged it belonged to Bertha and claimed that she managed the

money to protect Bertha from other relatives and obtained Bertha's consent before she transferred any of the money to her personal account and spent it on herself.

{¶20} The trial court's finding that Bertha owned a portion of the funds the state alleged had been stolen is not against the manifest weight of the evidence. Therefore, we overrule the first, second, and fourth assignments of error, and we overrule the third assignment of error to the extent it challenges the finding of ownership.

### E. Consent

{¶21} In the third assignment of error, Woodburn also argues that she was a "person authorized to obtain and exert control over" the $30,788.87 because the ACU agreement gave her the right to withdraw all of the funds in the accounts. In the fifth assignment of error, Woodburn maintains that the trial court erroneously concluded she owed a "fiduciary duty" to Bertha in connection with the $109,366.21 in annuity funds that required her to use the money for Bertha's benefit. These arguments relate to the issue of consent.

{¶22} The state did not present any evidence upon which the trial court could conclude that Woodburn obtained or exerted control over funds at ACU without the consent of Bertha. Holders of a joint and survivorship account "typically each have the right to withdraw all the funds from an account." *Ingram v. Hocking Valley Bank*, 125 Ohio App. 3d 210, 218, 708 N.E.2d 232 (4th Dist.1997). Consistent with that fact, the ACU agreement, which all three account holders signed, requested "24-hour access" to the account and a Debit MasterCard for each account holder that would allow them to use ATMs and pay for services and purchases directly from the checking account. Although Bertha did not remember opening the ACU checking and savings accounts,

she told Williams that she planned to deposit the remaining annuity funds at the credit union and have Woodburn "help manage" her money. Bertha admitted that she had memory issues and that her signature appeared to be on the ACU agreement. There is no evidence that Bertha's signature was forged, that she was coerced into signing the agreement, or that Woodburn's withdrawal of money from ACU violated the account terms to which Bertha agreed.

**{¶23}** No rational trier of fact could have found beyond a reasonable doubt that Woodburn obtained or exerted control over the funds at ACU without the consent of Bertha; the evidence demonstrates that Woodburn had consent to obtain and exert control over these funds. Therefore, Woodburn's conviction for violating R.C. 2913.02(A)(1) is not supported by sufficient evidence and is necessarily against the manifest weight of the evidence. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus ("When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt' " (Alteration in *Maxwell*)); *State v. Short*, 2d Dist. Montgomery No. 27192, 2017-Ohio-7200, ¶ 22 ("Where there is insufficient evidence to support a conviction, it will also necessarily be against the manifest weight of the evidence").

**{¶24}** " 'Once a person lawfully has control over property with consent, that person cannot thereafter *exert* control for a different purpose. That person already has control. Instead, what changes is whether or not the individual [acted] within the scope

of the consent.' " (Emphasis added in *Dortch*; alteration in *Roberts.*) *State v. Roberts*, 2d Dist. Montgomery No. 26431, 2015-Ohio-2716, ¶ 13, quoting *State v. Dortch*, 2d Dist. Montgomery No. 17700, 1999 WL 819569, *4 (Oct. 15, 1999). " 'If the individual begins to use the property for something outside what the owner specifically authorized, the individual has gone beyond the owner's consent. The [theft] statute allows for this precise situation in R.C. 2913.02(A)(2).' " *Id.*, quoting *Dortch* at *4.

**{¶25}** The state presented substantial credible evidence upon which the trial court reasonably could conclude, beyond a reasonable doubt, that Woodburn exerted control over the $109,569.21 in annuity funds beyond the scope of the express or implied consent of Bertha. Woodburn is correct that the record does not contain written instructions from Lawrence Zimmerman regarding use of the funds, evidence of a guardianship or trust, or evidence that Woodburn used a power of attorney to gain access to the funds, but R.C. 2913.02(A)(2) does not require such evidence. During the interview by Agent Barbeau, Woodburn acknowledged the funds belonged to Bertha and were for her use. Bertha testified that she never authorized Woodburn to spend the money on herself, and the trial court was free to disbelieve Woodburn's statement to the contrary and conclude she used Bertha's money beyond the scope of her consent.

**{¶26}** We conclude that Woodburn's conviction on Count One, the violation of R.C. 2913.02(A)(1), is not supported by sufficient evidence and is therefore against the manifest weight of the evidence and sustain the third assignment of error in part. However, the trial court's finding that Woodburn exceeded the scope of express or implied consent for purposes of Count Two, the violation of R.C. 2913.02(A)(2), is not against the manifest weight of the evidence. We overrule the remainder of the third

assignment of error to the extent it asserts otherwise and overrule the fifth assignment of error.

## IV.  CONCLUSION

{¶27}  We overrule the first, second, fourth, and fifth assignments of error.  We overrule the third assignment of error in part and sustain it in part.  We reverse the conviction for theft from a person in a protected class in violation of R.C. 2913.02(A)(1), affirm the finding of guilt for theft from a person in a protected class in violation of R.C. 2913.02(A)(2), and remand for the trial court to sentence Woodburn on that offense.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART,
AND CAUSE REMANDED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.

For the Court


BY: _____
       Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**